IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AHMAD MOTLEY, *et al.*, | ) | CASE NO. 1:05 CV 2506 |
| | ) | |
| Plaintiffs, | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| v. | ) | |
| | ) | |
| WENDY'S OLD FASHION | ) | **MEMORANDUM OPINION** |
| HAMBURGERS, INC., *et al.*, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

## I.  Introduction

Shaker Heights students Ahmad Motley and Rasheed Muhammad (the students)[1] and

their parents[2] claim that, in violation of state and federal law, they were physically injured,

or suffered other losses, as a result of how Wendy's restaurants (Wendy's),[3] the City of

---

[1] Motley and Muhammad were minors and students at Shaker Heights High School in September, 2004 when the incident at issue here took place.  *See*, ECF # 20 (first amended complaint) at ¶¶ 1, 3; *see also*, ECF # 51, Ex. 1 (deposition of Ahmad Motley) at 4).

[2] Plaintiff Ahmad Gray is the parent of Ahmad Motley.  Plaintiffs Roosevelt and Akila Muhammad are the parents of Rasheed Muhammad.  *See*, ECF # 20 at ¶¶ 3, 4.

[3] Defendant Western Reserve Management, Inc. operates the Wendy's Old Fashion Hamburgers restaurant here.  Both Western Reserve Management and Wendy's were named as defendants.  *See*, ECF # 20.

Cleveland Heights[4] and individual security guards/police officers[5] (collectively, the City) responded to fighting outside a Wendy's location that came to involve the students.

The plaintiffs allege that the students, wearing clothing identifying them as from Shaker Heights,[6] were improperly turned out of the restaurant into a large, unruly crowd leaving a Cleveland Heights football game across the street by Jason Hetrick, an off-duty Cleveland Heights police officer being paid by Wendy's to provide security at the restaurant.[7] Hetrick is then further alleged to have prevented the students from re-entering the locked restaurant to seek safety once the crowd began to assault the students.[8]

The plaintiffs also maintain that after the students were attacked, the City improperly detained them as it made arrests for rioting and in so doing was deliberately indifferent to their medical needs.[9] The parents further allege that they incurred medical expenses in treating the students' injuries  and sustained other damages, such as loss of consortium, as a result of those injuries.[10]

_____

[4] The City of Cleveland Heights is named as a defendant. *See*, *id.*

[5] The first amended complaint names Cleveland Heights Police Chief Martin Lentz, Cleveland Heights patrol officer Jason Hetrick and four John Doe Cleveland Heights police officers as defendants. *Id.*

[6] *See*, ECF # 51, Ex. 1 (Motley deposition) at 25.

[7] ECF # 20 at ¶¶ 16, 17, 21-23.

[8] *Id.* at ¶¶ 17, 21-23.

[9] *Id.* at ¶¶ 26-28.

[10] *Id.* at ¶¶ 31-33.

In response, Wendy's and the City initially both maintain that Officer Hetrick was acting at all times here as a Cleveland Heights police officer, not as a Wendy's security guard.[11]  Both Wendy's and the City also contend that it could not have been foreseen that the students would be in danger from being told to exit Wendy's at closing time under the conditions observable from within the restaurant.[12]  Moreover, Wendy's contends that Officer Hetrick's decision not to permit re-entry into the locked restaurant was made as a police officer, not as an agent of Wendy's.[13]

For its part, the City argues that:  (1) it has immunity from suit in Ohio law for actions taken here;[14] (2) the plaintiffs have not shown the existence of any City policy that would trigger federal law liability under § 1983;[15] (3) there was probable cause for any post-fight arrests;[16] (4) Officer Hetrick's actions, including the denial of re-entry into the restaurant, do not "shock the conscience;"[17] and (4) it was not deliberately indifferent to the students' injuries.[18]

---

[11] *See*, ECF # 61 (City's reply brief) at 3-4 and ECF # 54 at 12 (Wendy's memorandum in support).

[12] ECF # 54 (Wendy's) at 7-10; ECF # 61 (City's reply brief) at 1-3.

[13] ECF # 54 at 11-13.

[14] ECF # 52, Ex. 1 at 10-11.

[15] *Id.* at 8-10.

[16] *Id.* at 12-13.

[17] *Id.* at 17-22.

[18] *Id.* at 13-16.

Moreover, the City asserts that any charges against unnamed John Doe police officers should be dismissed since they have neither been identified nor served, and any claims against Chief Lentz individually should also be dismissed since there is no evidence of his personal involvement here.[19]  Also, both defendants claim that the parents here cannot recover damages because they have not proven what they spent for the students' medical care and are not eligible for derivative damages.[20]

This matter was originally filed in state court and removed here,[21] where the parties subsequently consented to the jurisdiction of the Magistrate Judge.[22]  After the complaint was amended,[23] motions for summary judgment were then filed separately by each defendant.[24]  The plaintiffs responded in opposition,[25] and oral argument on the motions was held.[26]  After

---

[19] *Id*. at 17.

[20] *See*, *id*. at 23-25 and ECF # 54 at 13.

[21] ECF # 1.

[22] ECF # 10.

[23] ECF # 20.

[24] ECF ## 52 (City), 53 (Wendy's).

[25] ECF ## 58 (contra Wendy's), 59 (contra City). Wendy's, ECF # 62, and the City, ECF # 61, filed reply briefs.

[26] ECF # 66.

oral argument on these motions was held, supplemental briefs were filed by the plaintiffs[27]

and the City.[28]

For the reasons that follow, the Court finds that:

(1)     the John Doe defendants are dismissed from the case;

(2)     all federal claims against Chief Lentz personally are to be construed as claims against the City of Cleveland Heights and Chief Lentz, individually, is dismissed from the case for purposes of state law claims;

(3)     the state law claims asserted against Officer Jason Hetrick personally in Counts II and III remain in the case inasmuch as no motion for summary judgment concerning such claims was made based on state law immunity for an individual;

(4)     the City's motion for summary judgment in its favor as to all state law claims asserted against it as a political subdivision is granted;

(5)     the City's motion for summary judgment in its favor as to the federal law claim of lack of probable cause for the students' arrest is denied;

(6)     the City's motion for summary judgment as to the federal claim of failure to afford medical attention to the students while in custody is granted;

(7)     the City's motion for summary judgment as to plaintiff parents' damages claims is granted in part and denied in part as is more fully explained below;

(8)     Wendy's is entitled to summary judgment as to all claims asserted against it.

---

[27] ECF # 69.

[28] ECF # 68.

## II.  Facts

Although the parties vigorously dispute many details, the material facts here are relatively straightforward and not contested.  In fact, during oral argument on the supplemental briefs, the parties agreed to a chronology of the events at issue,[29] which forms the foundation for what follows.

During the evening of September 17, 2004, Shaker Heights High School students Ahmad Motley, Rasheed Muhammad and some friends left a Cleveland Heights/Maple Heights football game they had been watching to go to the Wendy's restaurant across Cedar Road in Cleveland Heights.[30]  The students drove to Wendy's, parked in the restaurant's adjacent parking lot, went inside, and ordered some food.[31]

At about 9:30 p.m.,[32] while eating in the Wendy's dining room, the students were told to leave the restaurant by Jason Hetrick,[33] a Cleveland Heights police officer who was then

---

[29] *See*, ECF # 70, Ex. B.  The transcript of this oral argument and the attachments were manually filed.

[30] ECF # 51, Ex. 1 (Motley deposition) at 6, 7; Ex. 3 (Muhammad deposition) at 3, 4.

[31] *Id*., Ex. 1 at 10, 11, 16, 18; Ex. 3 at 4.

[32] *See*, ECF # 59 (plaintiffs memorandum in opposition) at 2.  While all accounts are that the incidents began sometime before the restaurant was scheduled to close at 10:00 p.m., the Court, consistent with the fact that the plaintiffs are the non-moving parties, has adopted their statement as to the time the events commenced.

[33] ECF # 70, Ex. B (joint chronology).

off-duty and employed by Wendy's as a security guard.[34]  Hetrick[35] and others[36] testified that he told the students they were being asked to leave because the restaurant was closing for the night; Motley[37] and Muhammad[38] testified that they didn't know why they were being asked to leave.

Hetrick and Greg Shanklin, the Wendy's manager that night, testified that when the dining room was cleared for closing, they did not notice any disturbances outside the restaurant.[39]  Motley testified that he noticed a crowd outside the restaurant at the time he was told to leave but did not observe any fighting.[40]  Muhammad said that when he was told to leave, he did observe some fighting in the crowd outside Wendy's[41] but further testified that the fighting was not in the adjacent parking lot.[42]  Consequently, Muhammad stated that he believed when he was told to leave the restaurant, he could "go straight to our car [in the

---

[34] *See*, ECF # 51, Ex. 10 (Hetrick deposition) at 10, 12.  There appears to be no dispute that Hetrick was in his police uniform while at Wendy's.  *See*, *id.*, Ex. 4 (Muhammad deposition, vol. 2) at 63.

[35] *Id.,* Ex. 10 at 16.

[36] *Id.*, Ex. 8 (David Daley deposition) at 6; Ex. 9 (Cordale Waits deposition) at 9.

[37] *Id.*, Ex. 1 (Motley) at 24.

[38] *Id.*, Ex. 3 (Muhammad deposition, vol. 1) at 7.

[39] *Id.*, Ex. 10 (Hetrick) at 18; Ex. 11 (deposition of Greg Shanklin) at 25, 34, 38.

[40] *Id.*, Ex. 1 at 31, 37.

[41] *Id.*, Ex. 3 at 13.

[42] *Id.*, Ex. 4 (Muhammad deposition, vol. 2) at 60.  Muhammad described the crowd as fighting "all around the building" on the street and sidewalk.  *Id.* at 59-60.

parking lot] and leave."[43]  None of the students who were cleared from the Wendy's dining room remarked to each other that they would be in danger if they left,[44] nor did any of them protest to Hetrick or the Wendy's manager at the time they were told to leave that they were being put at risk by being told to leave the restaurant.[45]

While the students were leaving Wendy's, a verbal dispute arose just outside the door to the restaurant between Hetrick and two of the students.[46]  As a result of this altercation, Hetrick decided to take three members of the student group back into the restaurant for questioning.[47]  Most of the other students remained outside the door to the restaurant parking lot.[48]  Muhammad testified that in going back into the restaurant, Hetrick locked the restaurant door behind him.[49]

---

[43] *Id.* at 65.

[44] *Id.* at 64-65.

[45] *Id.*; ECF, Ex. 1 (Motley) at 35.

[46] ECF #70, Ex. B (joint chronology).  The two students were Jimmy McClure and a girl identified as De'Shea Howard.  *See*, *id.*; ECF # 51, Ex. 12 (deposition of Jimmy McClure) at 12, 29-31.

[47] ECF # 70, Ex. B (joint chronology).  Those brought back into the restaurant were McClure, Howard, and Kenny Owens, De'Shea Howard's boyfriend.  *See also*, ECF # 51, Ex. 12 (McClure deposition) at 12, 28, 31.

[48] *Id.*, Ex. 1 (Motley) at 28; *see also*, ECF # 51, Ex. 12 (deposition of Jimmy McClure) at 12. (Two of the Shaker students who were told to leave the restaurant at that time with the others did not wait by the door but went directly to their cars.  These two students were not injured or accosted by the crowd and they are not plaintiffs here.)

[49] ECF #70, Ex. B (joint chronology).  Hetrick agrees that he locked the doors sometime after 9:30 p.m.  *See*, ECF # 51, Ex. 10 (Hetrick deposition) at 26.

As Hetrick was inside talking with some of the students, Muhammad, who, like Motley, was wearing clothing identifying him as from Shaker Heights High School,[50] was alerted by one of the students inside Wendy's[51] that the crowd on the street was getting nearer to the restaurant parking lot.[52]  That crowd was by then "attacking ... cars, throwing bricks and stomping on hoods."[53]

From outside the restaurant, Muhammad then yelled in to Hetrick that "we are going to get jumped" if Hetrick did not unlock the door to let them back into the restaurant.[54] According to Muhammad, Hetrick responded with a vulgarity, saying that if they were afraid, they should stand near the door.[55]  Hetrick, however, did not unlock the door as a result of this exchange, nor did any student standing outside repeat the request to Hetrick to re-enter Wendy's.  In the end, the students who were standing outside believed Muhammad's comment to Hetrick about feeling afraid "was asking for us to go [back] into the restaurant."[56]

---

[50] ECF # 51, Ex. 3 (Muhammad) at 15; *see also, id.*, Ex. 1 (Motley) at 25.  The two were teammates on the Shaker Heights High School football team and were wearing "Shaker football gear" at the time.  *Id.*

[51] That student was Kenny Owens.  *See*, ECF # 70, Ex. B (joint chronology).

[52] ECF # 51, Ex. 3 (Muhammad) at 14.

[53] *Id.* at 12.

[54] *Id.* at 11.

[55] *Id.*  Hetrick denies using the vulgarities attributed to him by Muhammad.  *See*, ECF # 51, Ex. 10 (Hetrick deposition) at 27.

[56] ECF # 51, Ex. 1 (Motley deposition) at 27.

Very shortly after this exchange,[57] the students outside Wendy's were set upon by members of the crowd.[58]  While it is unclear as to whether Hetrick went outside to assist the Shaker students or remained inside the restaurant,[59] it is undisputed that additional Cleveland Heights police were summoned to break up the fight[60] and that arrests were made for "aggravated rioting."[61]  Those arrested included Motley and Muhammad.[62]  The two students, along with four others arrested then, were taken to the Cleveland Heights jail, booked, and released an hour and a half later.[63]

---

[57] The time during which the students were outside was variously estimated from approximately two minutes (ECF # 51, Ex. 10 (Hetrick) at 35-36) to five minutes (ECF # 51, Ex. 8 (Daley) at 8), to five to ten minutes (ECF # 51, Ex. 9 (Waites) at 12, 20).

[58] ECF # 70, Ex. B (joint chronology).

[59] *Id.*

[60] *Id.*

[61] *See*, ECF # 52, Ex. B (manually filed exhibits to City's motion for summary judgment) at 80-82.  Cleveland Heights police uniform incident/offense report for incident at 10:00 p.m. on September 17, 2004 at 13246 Cedar Road.

[62] *Id.*

[63] *Id.*  The incident report notes that the arrested individuals were booked at 10:30 p.m. and that they all had been released to their parents by midnight.  *See also*, ECF #70 (transcript of oral argument of April 17, 2007) at 74 where plaintiffs' counsel states that the period of time both Motley and Muhammad were in custody and delayed in receiving medical care was "[a]pproximately two hours."

Both students sustained injuries during the assault – Motley sustained a black eye, a bloody nose and other facial injuries,[64] while Muhammad suffered a split nose, swelling on his head and pain in his sternum.[65]

At the Cleveland Heights jail, Motley requested medical assistance sometime after 10:30 p.m.[66] and was transported by a City EMS vehicle to a hospital emergency room by midnight.[67]  He was discharged from the hospital with orders to avoid strenuous activity for five days, take pain medication as needed and return for further treatment if he experienced a persistent headache or any vision problems.[68]  Muhammad, who asked police to take him to the hospital at the scene but does not recall whether he asked for medical assistance from

---

[64] *Id.* at 83 (EMS run sheet) and 85-86 (Kaiser emergency room exam and diagnosis). Motley testified to a bloody nose as a result of the assault, ECF # 51, Ex. 1 (Motley deposition, vol. 2) at 67, but that injury does not appear on the other two medical records.

[65] ECF # 51, Ex. 4 (Muhammad deposition, vol. 2) at 53, 55.

[66] The jail booked the arrested juveniles at 10:30. ECF # 52, Ex. B at 80.

[67] *Id.*  The police incident report states that all arrested persons had been released from jail by midnight.

[68] *Id.* at 85-86.

the City while at the jail,[69] was taken by his parents later that night to a different hospital for treatment.[70]

## III.   Analysis

### A.   Dismissal of the John Doe defendants

The City has moved that any claims against the three John Doe Cleveland Heights police officer defendants be dismissed because those defendants have neither been named nor served.[71]  The plaintiffs in response assert that the John Doe police officers "played a role in the events surrounding the incident," are "properly named," and should not be dismissed.[72]

---

[69] ECF # 51, Ex. 4 at 51, 53.

[70] *See, id.* at 53-57.  The Court notes that the plaintiffs sought to place additional medical evidence into the record after the close of discovery in this case.  *See,* ECF # 69, Ex. 1. The City then moved to strike this new evidence or, alternatively, to submit additional briefs. ECF # 71.  In a non-document entry of May 3, 2007, the Court denied the City's motion to strike.  The Court notes that a motion to strike was not an available remedy here. Fed. R. Civ. P. 12(f), which governs motions to strike, is applicable only to material in "pleadings," and is available only prior to the filing of a responsive pleading, or, if no response is required, within 20 days of the purportedly defective pleading.  It is specifically not available, as apparently intended here, to "strike" an evidentiary attachment submitted in response to a motion for summary judgment.  *Lombard v. MCI Telecomm. Corp.*, 13 F. Supp. 2d 621, 625 (N.D. Ohio 1998) (denying motion to strike evidence offered in opposition to motion for summary judgment since "the rule [concerning motions to strike] relates only to pleadings and is inapplicable to other filings").  While it is proper to move that inadmissible evidence be disregarded when addressing a motion for summary judgment, *see*, *State Mut. Life Assurance Co. of America v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir. 1979), the fact that the motions for summary judgment here may be resolved without recourse to any of the late-tendered evidence made denial of the motion to strike appropriate, without the Court attempting, *sua sponte*, to re-cast it as a motion to disregard or to authorize additional briefs.

[71] ECF # 52, Attachment 1 at 17; ECF # 61 at 11-12.

[72] ECF # 59 at 10.

Initially, the Court notes that while plainly other Cleveland Heights police officers in addition to Officer Hetrick assisted in controlling the fighting outside the restaurant, it is equally plain that a federal court has no personal jurisdiction over parties who have not been served or who have not received constructive notice of the suit against them.[73]  In that regard, the Court further observes that the plaintiffs have done nothing during the more than two years that this action has been pending to identify these John Doe officers, amend their complaint with that identifying information, and then properly serve the identified officers. Finally, due to expiration of the applicable limitations period here, the Court is aware that any attempt to now create personal jurisdiction here over newly-identified and properly served John Does would be time-barred.[74]

As a result, this Court is without personal jurisdiction over these three John Doe defendants.  They are properly dismissed from this case.

**B.    Status of claims against Chief Martin Lentz**

The City has moved that Cleveland Heights Police Chief Martin Lentz, named as a defendant here, be dismissed from this case as "Plaintiffs have produced no evidence that Chief Lentz was personally involved in any of the events surrounding the incident in this

---

[73] *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) (citation omitted); *see also, Raiford v. Dist. of Columbia*, 116 F.3d 942, 1997 WL 356229, at *3 (D.C. Cir., May 30, 1997) (Trial court "properly found no personal jurisdiction over the John Does who have not been served.").

[74] *See, Dye v. City of Warren*, 367 F. Supp. 2d 1175, 1182-84 (N.D. Ohio, 2005) (discussing application of constructive notice, relation-back rule and the limitations period in Ohio to John Doe "rank and file" police defendants in cases arising under 42 U.S.C. § 1983); *see also Cox v. Treadway*, 75 F. 3d 230, 239-40 (6th Cir. 1996).

-13-

matter."[75]  Plaintiffs, in opposition, assert that Lentz is "properly named a defendant herein because it was his failure to train his officers and his tacit, if not express, authorization of his officers' response to riot situations that led to the violations of Plaintiffs' constitutional rights."[76]

As was explained in *Hawks v. Jones*:[77]

> It is well-settled in this Circuit that, absent a clear indication that Section 1983 defendants are being sued in their individual capacities, courts must assume that they are being sued in their official capacities only.[78]

In that regard, it is imperative, despite the modern rubric relaxing the rigid rules of pleading, that a person being sued be clearly put on notice in the caption of the pleading or in the text of the pleading that he is being subjected to liability in his personal capacity.[79]

Here, Chief Lentz was notified in one paragraph of the body of the amended complaint that he was being sued in his personal, as well as official, capacities.[80]  However, plaintiffs also made it plain to Chief Lentz in other parts of the body of the amended

---

[75] ECF # 52, Ex. 1 at 17.

[76] ECF # 59 at 9.

[77] *Hawks v. Jones*, 105 F. Supp. 2d 718 (E.D. Mich. 2000).

[78] *Id*. at 722, citing *Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir. 1991); *Wells v. Brown*, 891 F.2d 591, 593 (6th Cir. 1989).

[79] *Wells*, 891 F.2d at 593.

[80] ECF # 20 at ¶ 6.

complaint,[81] and in their response to the City's motion for summary judgment,[82] that they were seeking to affix liability on him solely for what he did as "the chief decision-making person[nel] (sic) ... directly/indirectly responsible for the actions of his subordinates/ employees...."[83]

The Sixth Circuit has stated:

Respondeat superior is not a proper basis for liability under § 1983.  Nor can the liability of supervisors be based solely on the right to control employees, or simple awareness of employees' misconduct.  Furthermore, a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it.[84]

Here, the clear indication in the complaint is that Chief Lentz is being sued solely for what he did as "the chief decision-mak[er]" for the city police.[85]  There is no evidence in this record, as noted by the City, that Chief Lentz personally did any identifiable act that "encouraged the specific incident of misconduct or in some other way directly participated

---

[81] *Id.*

[82] ECF # 59 at 9.

[83] ECF # 20 at ¶ 6; *see also*, ECF # 59, at 9 ("Chief Martin Lentz is properly named a defendant because it was his failure to train his officers and his tacit, if not express, authorization of his officers' response to riot situations that led to violations of Plaintiffs' constitutional rights").

[84] *McQueen v. Beecher Cmty. Schools*, 433 F.3d 460, 470 (6th Cir. 2005); *see also*, Salehpour v. Univ. of Tenn., 159 F.3d 199, 206 (6th Cir. 1998) ("[S]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act.  Instead the liability must be based on active constitutional behavior.").

[85] ECF # 20 at ¶ 6.

in it," which evidence is required in order to maintain a federal action for damages against a municipal supervisor in a personal, individual capacity.[86]

Rather, the complaint and plaintiffs' response to the City's motion clearly show that Chief Lentz is being sued solely in his official capacity as chief of police for the City of Cleveland Heights.  In such cases, the rule in the Sixth Circuit is clear that "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit against that agency which that agent represents."[87]

Accordingly, plaintiffs' federal claims against Chief Lentz are here to be construed as claims against the City of Cleveland Heights.[88] Chief Martin Lentz in his personal, individual capacity is dismissed from this case as to all federal claims inasmuch as there is no evidence of record to sustain any federal claims against him personally.

As to state law claims against Chief Lentz personally, the Court finds that a similar analysis obtains.  Thus, the state law claims that have been asserted against Chief Lentz personally for false arrest and deprivation of medical attention are fatally flawed for a lack of any evidence of record that Chief Lentz was any more than the ultimate supervisor of the persons who made the arrest and denied or delayed medical care for the students. Accordingly, as with the federal claims, the Court will construe the state law allegations

---

[86] *McQueen*, 433 F.3d at 470.

[87] *Claybrook v. Birchwell*, 199 F.3d 350, 355, n.4 (6th Cir. 2000) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).

[88] *Petty v. County of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007).

against Chief Lentz as allegations against the city of Cleveland Heights and dismiss Chief Lentz personally from the case as to any state law claims against him.

### C.    Status of Officer Hetrick

The plaintiffs assert two theories by which Wendy's must assume responsibility for the actions of Officer Jason Hetrick:  (1) that, as a matter of law, Hetrick was acting as an employee and for the benefit of Wendy's both when (a) he cleared the dining room for closing and (b) when he refused the students re-entry into the restaurant after the verbal altercation developed;[89] and (2) if Hetrick's status is not clear as a matter of law, it should be a question for the jury.[90]

Wendy's contends that at the time Hetrick decided to question some students inside the restaurant while keeping the others outside by means of the locked door, he was solely acting "within the scope of his duties as a police officer, not as a Wendy's employee."[91]  The City, likewise, maintains that Hetrick's act in detaining some students for questioning in connection with a possible arrest was in furtherance of the governmental function of providing police services.[92]  The City does not appear to address Hetrick's status during the specific act of locking the doors after clearing the dining room, or keeping them locked.

---

[89] ECF # 58 at 10-11.

[90] *Id*. at 12.

[91] ECF # 54 at 11-12.

[92] ECF # 61 at 3-4.

-17-

The facts are that Hetrick was paid by Wendy's as part of an ongoing program of providing a uniformed off-duty Cleveland Heights police officer as security at the restaurant during and after sporting events at Cleveland Heights High School.[93]  The undisputed facts further show that Wendy's had a policy of clearing the dining room of all customers in advance of closing, which included a requirement that the security guard "escort people out" at that time.[94]

However, the record here does not show that Wendy's had any policy as to what should be done by the guard in cases where restaurant patrons were engaged in disorderly conduct after they had been dismissed from the restaurant.[95]  Moreover, there is no evidence that Hetrick's specific decision to detain some students for questioning as they were leaving the restaurant was done at the direction of Wendy's – either specifically by the Wendy's manager or by Hetrick in conformity with any Wendy's policy he may have believed existed.

With respect to the decision to lock the doors, the evidence of record is that such a decision was under the control of the police.[96]  Moreover, there is no evidence that once the doors were locked by Hetrick, Wendy's managers had any authority to compel Hetrick to

---

[93] ECF # 51, Ex. 11 (deposition of Greg Shanklin) at 11-12; see also, ECF # 51, Ex. 10 (Hetrick) at 10-12, 47.

[94] ECF # 51, Ex. 11 (Shanklin) at 9.

[95] In fact, the plaintiffs' brief in opposition to Wendy's summary judgment motion notes in several places that "Wendy's had no policy or procedure in place to deal with rioting or fighting" and never instructed Hetrick on what to do in such cases.  ECF # 58 at 11, 12.

[96] ECF # 51, Ex. 11 (Shanklin) at 24.  "[I]f the police asked [us] to lock the doors due to some trouble, we are supposed to lock them."

-18-

re-open them, let alone in a situation where Hetrick was conducting an examination of a suspect inside the locked restaurant.  Finally, Ohio law is clear that providing police services is a governmental, not proprietary function.[97]

Ohio law, which was cited by both parties, states:

When a private entity employs an off-duty police officer as a security guard, it will only be held vicariously liable [for the torts of that person] when the police officer, acting in a dual capacity of private employee and police officer, acted outside his public duties, but within the scope of his employment with the private entity, either for its benefit or at its direction.[98]

Here, as noted, there is no evidence that in stopping the students as they were leaving the restaurant Hetrick was acting pursuant to any policy of Wendy's concerning disorderly conduct nor in response to a specific order by Wendy's manager.  In addition, given Wendy's specific goal in having a security officer so as to "keep problems off the premises,"[99] Hetrick's act of returning disorderly patrons who were actually leaving back inside the restaurant can hardly be said to be something done for Wendy's benefit.

Moreover, as previously noted, the decision by Hetrick to lock the doors at Wendy's while conducting an examination of a suspect was also made while acting as a police

---

[97] *See*, Ohio Rev. Code § 2744(C)(2)(a).

[98] *Strickland v. Tower City Mgmt. Corp*., No. 71839, 1997 WL 793133, at *3 (Ohio App. 8 Dist., Dec. 24, 1997) (citing *Evans v. Smith*, 97 Ohio App. 3d 59, 66, 646 N.E.2d 217, 221-22 (Ohio App. 1 Dist., 1994)).

[99] ECF # 51, Ex.11 at 12.

-19-

officer.[100]  As also noted, there is no evidence in the record that Wendy's had any authority to compel Hetrick to re-open the restaurant under such circumstances.

Accordingly, the Court finds that Officer Hetrick was acting solely in his capacity as a Cleveland Heights police officer when he detained some students for questioning and locked the door.  Moreover, Wendy's had no authority to compel Officer Hetrick to unlock the doors once he had locked them and while he was conducting an interrogation inside. Officer Hetrick, however, was acting as a paid agent of Wendy's and pursuant to its stated policies, when he cleared the restaurant in advance of closing.

## D.    Summary judgment

### 1.    Overview

As noted, before the Court are summary judgment motions by Wendy's and the City, each motion raising distinct issues.  In the interest of clarity, the Court will consider the issues below according to each stated claim of the complaint.

The amended complaint states the following five claims:  (1) that both Wendy's and Jason Hetrick, acting as Wendy's employee, breached duties owed to business patrons under state law by negligently and recklessly placing the students in the midst of a riot, causing them injury; (2) Wendy's and Hetrick, now alleged to be acting in violation of 42 U.S.C. § 1983 and unspecified "applicable State of Ohio provisions," "shocked the conscience" by forcing the students out into the riot; (3) Cleveland Heights police, both individual officers

---

[100] *See*, ECF # 51, Ex.11 at 23-24 (identifying Hetrick as the one who locked the doors in this case and stating that Wendy's managers understood that the doors were to be locked "if the police asked....").

personally and as the City itself, also allegedly in violation of § 1983 and unspecified state law, beat, falsely arrested, and then denied medical treatment to the students; (4) as a result of the injuries incurred under both federal and state law by Motley, his father was forced to spend money on his care and be deprived of his services and companionship; and (5) a similar claim by the parents of Muhammad.[101]

## 2.  *Standard of review – summary judgment*

The standard of review for a motion for summary judgment is well-established and well-known.

The Federal Rules of Civil Procedure provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[102] Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact regarding any essential element of the nonmoving party's case on which the nonmovant would bear the burden of proof at trial.[103]

In that respect, a fact is "material" for purposes of summary judgment if proof of the fact would have the effect of establishing or refuting an essential element of the claim or a

---

[101] ECF # 20.

[102] Fed. R. Civ. P. 56(c).

[103] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

defense.[104]   A dispute over a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."[105]

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmovant's case.[106]  Once the moving party satisfies this burden, the burden shifts to the nonmoving party to set forth specific facts showing the existence of a genuine issue for trial.[107]

To create a genuine issue of material fact for trial, the nonmoving party must do more than raise some doubt or present merely colorable evidence.[108]  Further, it may not  simply rely on the allegations of the pleadings.[109]  However, the nonmoving party "need not 'produce evidence in a form that would be admissible at trial in order to avoid summary judgment.' Instead, the relevant inquiry is whether the nonmoving party has designated 'specific facts showing there is a genuine issue for trial.'"[110]

---

[104] *Kendall v. Hoover Co*., 751 F.2d 171, 174 (6th Cir. 1984).

[105] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

[106] *Celotex Corp*., 477 U.S. at 323.

[107] *Anderson*, 477 U.S. at 256.

[108] *Id*. at 249-50.

[109] *Cox v. Kentucky Dept. of Transp*., 53 F.3d 146, 149 (6th Cir. 1995).

[110] *O-So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 505 (6th Cir. 1992) (internal citation omitted).

The court must evaluate all the evidence presented "in the light most favorable to the party opposing the motion."[111]   In evaluating the evidence, however, the court is not permitted to judge the evidence or make findings of fact.[112]

In all this, the court must recognize that "summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules of civil procedure as a whole."[113]  Essentially, summary judgment is the means by which the moving party may compel the nonmovant to "put up, or shut up" with regard to a critical issue of material fact.[114]

---

[111] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[112] *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987).

[113] *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1034 (6th Cir. 1992) (citing *Celotex*, 477 U.S. at 327).

[114] *Cox*, 53 F.3d at 149 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

### 3.    *Count I – negligence by Wendy's and its employees*

*a.    Standard of liability – negligence*

It is axiomatic that, to recover on a negligence claim in Ohio,[115] a plaintiff must show

that the defendant owed the plaintiff a duty, that the defendant breached that duty, and that

the breach was the proximate cause of the plaintiff's injuries.[116]

"Duty, as used in Ohio tort law, refers to the relationship between the defendant and

the plaintiff from which arises an obligation on the part of the defendant to exercise due care

toward the plaintiff."[117]  The existence of a duty in a negligence action is a question of law

for the court to determine.[118]  Duty may be established by the foreseeability of harm, by

---

[115] Count I, which arises under Ohio law, is before the Court pursuant to 28 U.S.C. § 1367(a) which confers supplemental jurisdiction on federal courts over any state claims related to federal claims over which the court has federal jurisdiction.  *See*, ECF # 20 (amended complaint) at ¶ 11.  The Supreme Court in *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 348 (1988), has held that under 28 U.S.C. § 1367 "district court has discretion to remand a removed case to state court when all federal-law claims have dropped out and only state-law claims remain."  Because, as will be developed here, both federal and state claims will remain after disposition of the motions for summary judgment, there is no issue as to this Court continuing to exercise supplemental jurisdiction going forward.  *See also*, 28 U.S.C. § 1367(c)(3).

[116] *Chambers v. St. Mary's School*, 82 Ohio St. 3d 563, 565, 697 N.E.2d 198, 200 (1998).

[117] *Wallace v. Ohio Dept. of Commerce, Div. of State Fire Marshal,* 96 Ohio St. 3d 266, 274, 773 N.E.2d 1018, 1026 (2002), quoting *Commerce & Industry Ins. Co. v. Toledo*, 45 Ohio St. 3d 96, 98, 543 N.E.2d 1188, 1192 (1989).

[118] *Mussivand v. David*, 45 Ohio St. 3d 314, 318, 544 N.E.2d 265, 270 (1989).

common law, by statute or by circumstances.[119]  With respect to the foreseeability of harm, the Ohio Supreme Court has held:

> The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act.[120]

Accordingly, under Ohio law, "a business owner has a duty to warn or protect its business invitees from criminal acts of third persons when the business owner knows or should know that there is a substantial risk of harm to its invitees on the premises in the possession and control of the business owner."[121]

Ohio courts have taken two related, but distinct approaches[122] to determining when a business "knew or should have known" that there was "a substantial risk of harm to its invitees...."[123]  Some appellate courts focus solely on whether there had been a history of similar prior acts occurring on the premises.[124]  Other Ohio courts have adopted a "totality of the circumstances" analysis that seeks to determine a business owner's knowledge of

---

[119] *See*, *Wallace*, 96 Ohio St. 3d at 274, 773 N.E.2d at 1026.

[120] *Menifee v. Ohio Welding Products*, 15 Ohio St. 3d 75, 77, 472 N.E.2d 707, 710 (1984).

[121] *Simpson v. Big Bear Stores Co*., 73 Ohio St. 3d 130, 135, 652 N.E.2d 702, 705 (1995).

[122] *See*, *McKee v. Gilg*, 96 Ohio App. 3d 764, 767, 645 N.E.2d 1320, 1322-23 (Ohio App. 10th Dist. 1994).

[123] *Simpson*, 73 Ohio St. 3d at135, 652 N.E.2d at 705.

[124] *See*, *e. g.*, *Hickman v. Warehouse Beer Systems*, 86 Ohio App. 3d 271, 274, 620 N.E.2d 949, 950-51 (Ohio App. 2d Dist. 1993) (no history of prior armed robberies at drive-through liquor store created no basis for foreseeing shooting during robbery).

foreseeable risks from multiple sources.[125]  Because a duty to anticipate or foresee the criminal acts of a third person is an exception to the general rule that "a business is not an absolute insurer of the safety of its customers," Ohio courts employing the totality of the circumstances test hold that the circumstances "must be somewhat overwhelming before a business will be held to be on notice of and, therefore, under the duty to protect against, the criminal acts of others."[126]

Both the plaintiffs and Wendy's have cited to the appropriate Ohio law concerning the existence of a duty to business invitees, but each have reached different conclusions as to the law's effect in this case.

Wendy's asserts that the absence of any evidence that there was fighting directly in the parking lot controlled by the restaurant at the time Wendy's cleared the dining room and the fact that neither the Wendy's manager nor Hetrick received any protest from the students concerning their dismissal from the restaurant, "do not constitute the 'somewhat overwhelming' circumstances required by Ohio law to support the existence of a duty."[127]

For their part, the plaintiffs contend that the presence of a police officer at Wendy's during every football and basketball game at the high school across the street – a decision made as a result of prior instances of fighting – as well as the testimony of witnesses that

---

[125] *See*, *Feichtner v. Cleveland*, 95 Ohio App. 3d 388, 396, 642 N.E.2d 657, 662 (Ohio App. 8th Dist. 1994) (citing *Reitz v. May Co. Dept. Stores*, 66 Ohio App. 3d 188, 192-93, 583 N.E.2d 1071, 1073-74 (Ohio App. 8th Dist. 1990)).

[126] *Reitz*, 66 Ohio App. 3d at 193-94, 583 N.E.2d at 1075.

[127] ECF # 54 at 10.

there was fighting in the crowd on the surrounding sidewalk and street at the time the students were told to leave the dining room – show that this incident was foreseeable.[128]

b.      *Analysis of Count I – Wendy's was not negligent because the act of clearing the dining room was not the proximate cause of the students' injuries.*

While both parties have extensively discussed the necessary element of whether Wendy's had a duty to the students, neither party has addressed the equally necessary element of whether Wendy's decision to clear the restaurant, which was carried out by Officer Hetrick, was the proximate cause of the students' injuries.  It was not.

As the joint chronology makes clear, the students were told to leave the restaurant by Officer Hetrick, who was acting as a paid agent of Wendy's in accordance with Wendy's policy.  Then, as the students were leaving, a verbal dispute arose between Officer Hetrick and some of the students.  At that point, Hetrick, now acting solely as a Cleveland Heights police officer, elected to bring a few of the students who were already leaving the restaurant back inside Wendy's and locked to door so that the others remained outside.  Only at that point did the assault occur.

In defining proximate cause in cases of negligence Ohio law holds that:

Proximate cause is an act or failure to act which, in a natural and continuous sequence, directly produces the injury and without which it could not have occurred.[129]

_____

[128] ECF # 58 at 7-10.

[129] *Brott Mardis & Co. v. Camp*, 147 Ohio App. 3d 71, 75-76, 768 N.E.2d 1191, 1194 (Ohio App. 9th Dist. 2001) (citing *Jeffers v. Olexo*, 43 Ohio St. 3d 140, 143, 539 N.E.2d 614, 617 (1989)).

While the evidence is unclear as to how long the students were standing outside the Wendy's in their "Shaker gear" as the unruly Cleveland Heights football crowd passed by on the street and sidewalk,[130] the evidence is uncontroverted that the plaintiff students did not immediately leave Wendy's premises when they were told to leave the dining room.  Rather, the evidence is undisputed that these students chose to wait outside the restaurant and in view of the crowd.

Thus, even if *arguendo* a question would be present under other facts as to whether Wendy's had a duty to foresee a criminal assault on its premises in connection with clearing the dining room at the end of a  football game, the plaintiffs, under these facts, have failed to establish a claim of negligence against Wendy's because they have not shown how any action of Wendy's proximately caused the students' injuries.  Specifically, the proximate cause of the students' injuries here was their own decision not to immediately exit the premises, or at least to wait in their cars, upon being told to leave the dining room.

First, it is important to note that there is no claim that these  students had been arrested or had otherwise been directed to remain outside by Officer Hetrick or anyone acting for Wendy's.  In addition, as will be discussed later, because Officer Hetrick had no duty to unlock the doors to re-admit the students to the restaurant after the dining room had been

---

[130] As noted earlier, that period was testified to as being from two minutes (ECF # 51, Ex. 10 at 35-36 (Hetrick)) to five to ten minutes (ECF # 51, Ex. 9 at 12, 20 (Waites)).  In any event, whatever amount of time transpired, there is no dispute that the students were outside as a result of their own decision to do so.

cleared, his acts of locking the doors and keeping them locked cannot be the proximate cause of the students' injuries.

Further, as was discussed above, the undisputed fact is that two other students who were also asked to leave the restaurant at the same time went safely to their cars rather than choosing to remain outside the door.[131]  This undisputed evidence of itself shows that an alternative decision could have been made by plaintiff students after being told to leave Wendy's that would have resulted in them escaping injury.

In summary, the evidence establishes that the students' injuries were not proximately caused by Wendy's decision to enforce its policy of clearing the dining room nor by Officer Hetrick's decisions to lock the doors and keep them locked.  Rather, the students' injuries occurred in a "natural and continuous sequence" from their  own decision to remain outside the restaurant door after leaving Wendy's, and their injuries "could not have occurred" in the absence of that decision.

Therefore, even with all disputed facts resolved in favor of the plaintiffs, Wendy's is entitled to summary judgment in its favor as to the claim that it was negligent in dismissing the plaintiffs from the dining room in preparation for closing since that act was not the proximate cause of the plaintiffs' injuries.

---

[131] *See*, ECF # 51, Ex. 12 at 12.

**4.      Count II – Wendy's and Hetrick allegedly "shocked the conscience" by putting the students out into a riot.**

*a.      Overview*

The plaintiffs allege in the second count of the amended complaint that Wendy's and Officer Hetrick forced the plaintiffs to leave the restaurant into a riot occurring outside, thereby acting in a way that "shocked the conscience" by placing the plaintiffs at risk of assault in violation of both state and federal law.[132]

The Court notes initially that, as written, this count appears to incorporate the same inherent assumption that was present in Count I – namely, that all the injuries here were proximately caused by the act of clearing the dining room.  As such, this count should be subject to a similar analysis as that applicable to Count I – no liability for want of proximate cause.

However, mindful of the principle that "federal pleadings are to be construed liberally in order to prevent errors in draftsmanship from barring justice to litigants,"[133] the Court will construe Count II as stating a claim that Wendy's and Officer Hetrick "shocked the conscience" by making whatever decisions were responsible for leaving the students outside when trouble developed and they requested re-admittance.  Since those decisions (locking the door and failing to open it to allow re-entry), as previously noted, were solely Hetrick's and made while he was acting as a Cleveland Heights police officer, Count II is now understood as a claim that Hetrick and the City "shocked the conscience" by his decision to

---

[132] ECF # 20 at 7.

[133] *Ritchie v. United Mine Workers of America*, 410 F.2d 827, 832 (6th Cir. 1969).

lock the restaurant door after the students had left Wendy's at closing time, and by failing to unlock it when they came under assault.  Wendy's, because it bears no liability for these decisions, is not at risk in Count II.

Because plaintiffs have asserted that liability for this claim may be found both in federal law under 42 U.S.C. § 1983 and under state law, the analysis here as to what liability, if any, the City and Officer Hetrick may have is separated into individual sections dealing with federal and state law.

b.     *Standard of liability – municipal liability under federal law for deprivation of substantive due process rights by a person not employed by the municipality nor acting on its behalf*

(1)     Overview

The Court observes initially that, as discussed earlier,  plaintiff students were injured by members of a crowd of private citizens, not by direct actions of a municipal employee, such as a police officer.  Further, the injured students were not themselves being detained by police at the time of the assault.  Accordingly, as noted by the City, this claim does not involve a claimed Fourth Amendment violation.[134]

Rather, the claim here raises the following issue:

When, if ever, [does] the failure of a state or local governmental entity or its agents to provide an individual with adequate protective services constitute a violation of an individual's due process rights.[135]

In determining a response to that inquiry, the Sixth Circuit recently explained:

---

[134] ECF # 52, Ex. 1 at 18, n.44.

[135] *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 194 (1989).

-31-

The standard for establishing that executive-branch officials (as well as executive-branch agencies) have violated an individual's substantive due process rights is not an easy one to satisfy. "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone with state authority causes harm." Concerned that the Due Process Clause of the Fourteenth (and Fifth) Amendment not become a "font of tort law to be superimposed upon whatever systems may already be administered by the States," the Supreme Court has made it clear that mere negligence on the part of governments and their agents do not provide plaintiffs with a ticket to federal court to seek substantive due process relief.

To state a cognizable substantive due process claim, the plaintiff must allege "conduct intended to injure in some way unjustifiable by any government interest," and that is "conscience-shocking" in nature.[136]

As the Supreme Court held in *County of Sacramento v. Lewis*,[137] whether governmental conduct "shocks the conscience" depends on the specific facts of the case.[138]

In that regard, the Sixth Circuit, in *Claybrook v. Birchwell*,[139] has noted that:

[I]n situations where the implicated government actors are afforded reasonable opportunity to deliberate various alternatives prior to electing a course of action ..., their actions will be deemed conscience-shocking if they were taken with "deliberate indifference" towards plaintiffs' federally protected rights. In contradistinction, in a rapidly evolving, fluid and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation ..., the public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline."[140]

---

[136] *Mitchell v. McNeil*, 487 F.3d 374, 377 (6th Cir. 2007) (internal citations omitted).

[137] *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

[138] *Id.* at 851-53.

[139] *Claybrook*, 199 F.3d 350.

[140] *Id.* at 359, quoting *Lewis*, 523 U.S. at 852-53.

-32-

(2)     Three-part test for liability

Notwithstanding that the parties have exclusively focused on attempting to define what is meant by "shocking the conscience" and whether various acts here meet that definition, it is important to note that any analysis of whether the conduct of a municipal actor "shocks the conscience" is simply one element of a requisite three-part analysis of liability.

As recently noted by the Sixth Circuit in *McQueen v. Beecher Community Schools*,[141] due process liability for injuries suffered as a result of a state-created danger has three necessary elements:  "an affirmative act that creates or increases the risk, a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability."[142]  Accordingly, the Court will now discuss each requirement for liability in turn.

c.     *The actions of Officer Hetrick in locking the door to Wendy's and refusing the students waiting outside re-entry do not create due process liability.*

(1)     Affirmative acts that create or increase the risk

The first element of liability was framed by the Sixth Circuit in *Kallstrom* as follows:

> Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence.[143]

---

[141] *McQueen*, 433 F.3d 460 (6th Cir. 2006).

[142] *Id.* at 464 (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066-67 (6th Cir. 1998)).

[143] *Kallstrom*, 136 F.3d at 1066.

Here, it is important to observe again that the injured students on their own elected not to immediately go to their cars upon being told to leave Wendy's, as did two members of their group who, then, were not assaulted. While the Court is mindful that the injured students felt some measure of responsibility to those being questioned inside the restaurant not to leave the premises without them, the Court is also mindful that Officer Hetrick did not compel the students outside the restaurant to remain there while he conducted his investigation inside nor forbid them from going to their cars. The injured students, who had not been arrested and were free to leave the premises or wait inside their cars, must be said to have assumed the risk of being outside at that time.[144]

In that regard, the students' request to re-enter the locked restaurant, which arises from their own decision to remain outside the restaurant under those conditions, is no different from any request by any member of the public to seek protection from criminal activity by private actors. In such cases, for purpose of state-created-danger theory, courts note that there is no affirmative act by the municipal actor that then created or increased the risk.[145]

In similar circumstances, the Sixth Circuit has concluded that, absent a special relationship between the police and the § 1983 plaintiff, such as the plaintiff being in police custody, police have no duty under § 1983 to take an assault victim into protective custody

---

[144] *See*, *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006) (where victim voluntarily elected to watch an illegal drag race, officers' failure to stop the race did not make the victim "'more vulnerable' to the risk that she had already undertaken....").

[145] *See*, *id.* ("[A] failure to act is not an affirmative act under the state-created-danger theory") (citing *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)); *see also*, *McQueen*, 433 F.3d at 465 (discussing cases).

to prevent further injury[146] nor to intervene in a fight to protect a citizen from harm by private

parties.[147]  As the Sixth Circuit also noted under similar circumstances present in yet another

case, *Gazette v. City of Pontiac*:[148]

> At most, the City and the police officer[] failed to rescue [the plaintiffs], and
> did not "create the danger" in which [they] found [themselves]. [The plaintiffs]
> may have a state law claim for gross negligence against the defendants, but
> these facts do not give rise to a constitutional tort under Section 1983.[149]

Accordingly, the Court finds that the plaintiffs here cannot establish the first element

of due process liability for a state-created-danger since Officer Hetrick (1) did not create the

circumstances in which the students found themselves; (2) did not increase their risk, given

that the students themselves, prior to the assault, elected not to remove themselves from the

risk of contact with the crowd by immediately leaving the premises or waiting in  their cars;

and (3) because no special relationship has been alleged or proved to exist between the

students and Officer Hetrick, he was under no duty to unlock the door to protect them from

the criminal conduct of private parties.

---

[146] *Weeks v. Portage County Executive Offices*, 235 F.3d 275, 279 (6th Cir. 2000).

[147] *Tucker v. Callahan*, 867 F.2d 909, 914 (6th Cir. 1989).

[148] *Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994).

[149] *Id.* at 1065, relying on *DeShaney*, 489 U.S. at 195-97 (no violation of an
individual's right to due process occurs by failing to protect individual from criminal conduct
of a private actor absent a special relationship between the individual and the state actor, such
as being in custody, giving rise to a duty to protect).

(2)     Special danger

In addition to an affirmative act, a plaintiff alleging a violation of due process rights by reason of a state-created-danger must also show the existence of a "special danger."[150] A special danger exists "where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large."[151]

Here, once the students had been told to leave the restaurant and then left, they were in the same position as all other persons outside the restaurant at that time.  As such, Officer Hetrick's decision to keep the door locked did not treat these plaintiffs any differently or create any danger special to them that did not exist for all other persons on the street or sidewalk at that time.  Accordingly, the risk of injury to which these plaintiffs were exposed was the same as that experienced by the public at large.  Thus, the plaintiffs cannot show that police action created a "special danger" specifically to them, which is the necessary second element of liability.

d.     *State culpability*

Inasmuch as the plaintiffs here have not established the first two foundational elements to liability, specifically (1) the existence of "affirmative acts" by the municipal actor which (2) placed the plaintiffs in "special danger," it is not possible to perform the third element of *Kallstrom* analysis – whether the municipal actor took the act that placed the plaintiff in special danger in such a way as to incur liability.  Without a putatively violative

---

[150] *Kallstrom*, 136 F.3d at 1066.

[151] *Id.*

-36-

act that created a discernable special danger, there is no basis for evaluating whether the act that created that danger was "conscience shocking" under either the "deliberate indifference" standard or the "sadistic and malicious" rubric delineated in *Claybrook*.[152]

Nonetheless, even if, *arguendo*, the decision to keep the doors locked would be seen as the affirmative act which placed these plaintiffs in special danger, the facts do not show that Officer Hetrick, who was operating in the midst of a "rapidly evolving, fluid and dangerous predicament which preclude[d] the luxury of calm and reflective pre-response deliberation," acted "maliciously and sadistically for the very purpose of causing harm" to the plaintiffs in making that decision.[153]

While the evidence is clear, construed favorably to the students, that Hetrick, for unspecified reasons, wanted to "teach [the students] a lesson" and "give [them] a hard time" that evening at Wendy's,[154] both Muhammad and Motley also clearly stated that they do not believe Hetrick wanted or intended to injure them.[155]  Moreover, the evidence is equally clear that Herrick was primarily focused on interrogating suspects and maintaining order inside the restaurant while the situation outside on the sidewalk and street was rapidly changing.

As such, this is the precise situation contemplated in *Claybrook* where there was no opportunity for "calm and reflective pre-response deliberation" by Hetrick before

---

[152] *Claybrook*, 199 F.3d at 359.

[153] *See*, *id.*

[154] *See*, ECF # 51, Ex. 3 (Muhammad deposition) at 15.

[155] *Id*. at 45; ECF # 51, Ex. 1 (Motley deposition) at 57.

Muhammad yelled from outside the locked restaurant that they were going to "get jumped" unless Hetrick immediately unlocked the door.  Under those circumstances, even Hetrick's choice to respond with a vulgarity and the remark that, if afraid, they should stand near the door, would only be actionable if it was done "maliciously and sadistically with the very purpose of causing harm" to the students.

However, inasmuch as neither Muhammad nor Motley believe that Hetrick did intend to deliberately hurt them in such a fluid situation, the Court cannot conclude that Hetrick's decision not to unlock the door would be "malicious or sadistic" if keeping the doors locked was found to be the affirmative act that placed plaintiffs in special danger.

Accordingly, the Court finds, after construing the evidence and inferences in favor of the plaintiffs, that plaintiffs have not established nor could they establish any of the three necessary elements for federal due process state-created-danger liability on the part of Officer Hetrick or the City.

*e.*    *The City is immune from liability under Ohio law, but because no specific claim of immunity under Ohio law has been directly asserted for Officer Hetrick individually, the Court makes no findings as to his personal liability, if any, under Ohio law.*

(1)    Ohio law

Ohio law generally provides that, subject to certain stated exceptions, "a political subdivision is not liable in damages in a civil action for injury ... to person ... allegedly caused by an act or omission of the political subdivision or any of its employees in connection with a governmental or proprietary function."[156]

---

[156] Ohio Rev. Code § 2744.02(A)(1).

There is no dispute that providing police protection[157] and operating a jail[158] are regarded by the statute as being "government functions" of political subdivisions.

The Ohio Supreme Court is clear that "[p]olitical subdivisions are shielded from civil liability as provided by R.C. Chapter 2744.  R.C. 2744.02(A) creates a broad immunity, subject [only] to certain enumerated exceptions."[159]  While there are stated exceptions for the immunity of political subdivisions for injuries caused by the negligent acts of employees performing proprietary functions, "[t]here is, however, no such general exception for governmental functions."[160]  The rule of interpretation in Ohio for this statutory grant of immunity to a political subdivision is that "[i]f none of the exceptions to immunity apply, the political subdivision is immune from suit."[161]

As noted earlier, the statute defining governmental functions specifically includes providing police protection and operating a jail as such functions.  Consequently, Ohio courts

---

[157] *Id.* at § 2744.01(C)(2)(a).

[158] *Id.* at § 2744.01(C)(2)(h).

[159] *Wilson v. Stark County Dep't of Human Servs.*, 70 Ohio St.3d 450, 452, 639 N.E.2d 105, 107 (1994).

[160] *Id.*

[161] *Wynn v. Butler County Sheriff's Dep't*, No. CA98-08-175, 1999 WL 160942, at *2 (Ohio App. 12 Dist. March 22, 1999), citing *Burgess v. Doe*, 116 Ohio App. 3d 61, 63, 686 N.E.2d 1141 (Ohio App. 12 Dist. 1996).

have recognized statutory immunity in favor of political subdivisions in cases alleging false arrest[162] and refusing or delaying provision of medical attention to one in police custody.[163]

Ohio statutory law, however, grants immunity to individual police officers under a separate section. That provision, Ohio Revised Code § 2744.03(A)(6), further states that an individual employee engaged in performing a governmental or proprietary function is "immune from liability [for injury, death or loss to person or property allegedly caused by an act or omission] unless ... (b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."[164]

While the grant of individual immunity is similar to that granted to the political subdivision in that it effectuates a general grant followed by exceptions,[165] it differs in that it contains an exception, as noted, for acts or omissions done by an individual with malice, in bad faith, or in a wanton or reckless manner.

(2)     The City of Cleveland Heights is immune from state law claims.

Here, the City of Cleveland Heights asserts that both the City and Officer Hetrick were engaged in a governmental function while providing police services, and thus the City is entitled to immunity from suit by operation of Ohio Revised Code § 2744(A)(1) since none

---

[162] *Id.*

[163] *Maggio v. City of Warren*, No. 2006-T-0028, 2006 WL 3772258, at *6 (Ohio App. 11 Dist. Dec. 2006); *Hiles v. Franklin County Bd. Of Comm'rs*, No. 05AP-253, 2005 WL 3557454, at *10 (Ohio App. 10 Dist. Dec. 30, 2005).

[164] Ohio Rev. Code § 2744.03(A)(6)(b).

[165] *See*, *Campbell v. Burton*, 92 Ohio St. 3d 336, 344, 750 N.E.2d 539, 546 (2001) (Cook, J. dissenting).

-40-

of the exceptions to the immunity granted political subdivisions providing governmental services listed in Ohio Rev. Code § 2744.02(B)[166] apply in this case.[167]  Plaintiffs contend that since Officer Hetrick and the City were performing a proprietary, not governmental, function when Officer Hetrick cleared the dining room, liability should attach through one of the exceptions to the grant of immunity for acts done while performing a proprietary function.[168]

The Court observes that, as previously noted, the acts taken by Officer Hetrick to clear the dining room were done as a paid Wendy's security guard and not as part of the governmental function of providing police services.  However, as also noted, this act was not the proximate cause of the students' injuries.  As such, it cannot, as argued by the plaintiffs, be the basis for liability against the City under Ohio Revised Code § 2744.02(B)(2), which states that no immunity is granted to political subdivisions for the negligent acts of employees performing proprietary functions.

---

[166] Ohio Rev. Code § 2744(B) imposes liability on a political subdivision by creating an exception to the blanket grant of immunity only with respect to: (1) the negligent operation of motor vehicles under certain circumstances; (2) acts caused by employees in connection with performing proprietary functions; (3) failure to keep streets, sidewalks, bridges and public grounds open, in repair and free from nuisance; (4) negligence by an employee occurring in or upon the grounds of buildings used in connection with a governmental function which injuries are due to physical defects within the building or grounds; or (4) when liability is expressly imposed by statute.  Since the Court has determined the scope of governmental and proprietary functions here, none of these exceptions are involved in the balance of the amended complaint.

[167] *See*, ECF # 52, Ex. 1 at 10-11.

[168] *See*, ECF # 58.

As to the acts taken by Officer Hetrick in the performance of the governmental function of providing police services such as locking the door to Wendy's and not opening the door when the students requested re-entry, Ohio Revised Code § 2744.02(A)(1) is clear that the City is entitled to immunity for actions taken by Officer Hetrick in that regard since none of the specified exceptions to immunity exist here.[169]

Moreover, as previously noted, any liability under state law against the City of Cleveland Heights for false arrest, failure to adequately train or supervise its police and/or to operate its jail with proper attention to detainee's medical needs, is precluded by Ohio's statutory grant of immunity.

In addition, since all of these allegations involve recognized governmental functions, the Sixth Circuit, construing Ohio law, has held that where, as here, a political subdivision is already found to be entitled to immunity under Ohio Revised Code § 2744.02(A)(1) for performing governmental functions, liability cannot be created by recourse to yet another portion of Ohio law, Ohio Revised Code § 2744.03, which imposes liability on a political subdivision for injuries resulting from the exercise of judgment or discretion in determining how to use equipment and personnel that were made with malicious purpose, in bad faith, or in a wanton or reckless manner.[170]

---

[169] *Swanson v. Columbus*, 87 Ohio App. 3d 748, 751, 622 N.E.2d 1181, 1183 (Ohio App. 10 Dist. 1993). "R.C. 2744.02(A) confers blanket immunity upon political subdivisions with respect to all governmental functions unless R.C. 2744.02(B) expressly provides that the political subdivision will be liable."

[170] *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995) (citing *Farra v. City of Dayton*, 62 Ohio App. 3d 487, 496, 576 N.E.2d 807, 813 (Ohio App. 2 Dist. 1989)).

Accordingly, the Court finds that the City of Cleveland Heights is entitled to immunity under Ohio law for all  claims against it alleged here.

(3)     The Court here makes no findings as to any personal liability of Officer Hetrick under state law.[171]

As noted above, in addition to granting immunity to a political subdivision for an injury allegedly caused by its employees while they were performing a governmental function,[172] Ohio law in a separate section also states that the individual employee of the political subdivision may himself be entitled to immunity in such circumstances unless the employee actions were "manifestly outside the scope of the employee's employment or official responsibilities"[173] or done "with malicious purpose, in bad faith, or in a wanton or reckless manner."[174]

Here, the City[175] bases its entire motion for summary judgment as to all state law claims exclusively on one portion of Ohio law dealing with immunity for a political subdivision for acts done by its employees while performing a governmental function, but does not specifically seek summary judgment, based on another portion of state law, for

---

[171] The amended complaint does clearly specify that Officer Hetrick is sued here in both his official and individual capacities. *See*, ECF # 20 at ¶ 7.

[172] Ohio Rev. Code § 2744.02(A)(1).

[173] Ohio Rev. Code § 2744.03(A)(6)(a).

[174] Ohio Rev. Code § 2744.03(A)(6)(b).

[175] The "City" here, as noted, means the City of Cleveland Heights and Officer Jason Hetrick, since the remaining City defendants have been dismissed.

Officer Hetrick personally as to any state law claims asserted against him.[176]  For their part, the plaintiffs argue that Officer Hetrick should be personally liable and not entitled to immunity because he was negligent in both "kicking out Plaintiffs" from the dining room and then "preventing them from seeking refuge in the safe environment of the restaurant."[177]

While the Court has already concluded that Officer Hetrick was acting as a paid agent of Wendy's when he "kick[ed] out Plaintiffs" from the dining room and that this action cannot support a claim of negligence since it was not the proximate cause of the students' injuries, the Court is without a basis to consider any claim of immunity arising under Ohio law in favor of Officer Hetrick personally for his actions taken as a police officer in "preventing [plaintiff students] from seeking refuge" in the restaurant since no such claim was ever asserted by the City's motion for summary judgment.

While, as is the case here, pleadings are to be liberally construed so as to do justice,[178] there is no basis by which a federal court may *sua sponte* craft a new claim onto a motion for summary judgment on the basis of purportedly discerning a party's unexpressed intention to present such a claim.

Accordingly, inasmuch as there is no motion now before the Court seeking summary judgment in favor of Officer Jason Hetrick based on immunity under Ohio law for state law claims asserted against him personally, the Court ventures no opinion as to the applicability

---

[176] *See*, ECF # 52 at 10-11.

[177] ECF # 59 at 6.

[178] *See*, *Ritchie*, 410 F.2d at 832.

of such immunity nor the merits of summary judgment in favor of Officer Hetrick personally on such claims.

f.      *The City is not liable under § 1983 for failure to train or for having an unconstitutional custom or policy.*

Although the parties have contested the issue of whether the City is liable under 42 U.S.C. § 1983 for failing to adequately train its police officers or for maintaining an unconstitutional custom or policy with respect to dealing with riot situations, a reading of the amended complaint here discloses no specific claim that the City failed to train its police for any specific situation or otherwise maintained a particular unconstitutional custom or policy with regard to training police.  Rather, the amended complaint generally asserts (1) that the City employed Chief Lentz, Officer Hetrick and other police officers and so, (2) "through its customs, practices, procedures, training, and policies, and/or lack thereof, is directly or indirectly responsible for the actions and/or omissions of its employees."[179]

In its response to the City's motion for summary judgment, the plaintiffs amplified that assertion by contending that while the City had no formal policy or training as to how to deal with riots, the lack of such a policy led to the creation of an informal policy of locking the doors of Wendy's which, in turn, led to the injuries suffered by the students.[180]

The City, in its reply, maintains that plaintiffs have not conducted any discovery to show whether or not the City had any training or policy as to riot situations.[181]  The City

---

[179] ECF # 20 at ¶ 5.

[180] ECF # 59 at 3-4.

[181] ECF # 61 at 7.

-45-

asserts that, contrary to the plaintiffs' contention, it does conduct training of its police for riot situations,[182] which training was completed by Officer Hetrick.[183]

The Court will analyze the City's motion for summary judgment as it relates to an improper training action under 42 U.S.C. § 1983 and maintaining an unconstitutional policy or custom in sequence below.

(1)    Improper training

The Sixth Circuit in *Fisher v. Harden*[184] has held that to prevail on a § 1983 claim of improper training, a plaintiff "must prove that [the police force] was deliberately indifferent to the rights of citizens that came into contact with [officers]."[185]  To establish deliberate indifference, the § 1983 plaintiff must "show prior instances of unconstitutional conduct demonstrating that the [defendant] has ignored a history of abuse and was clearly on notice that the training in this area was deficient and likely to cause injury."[186]  Moreover, the failure to train must be "closely related to" or "actually cause[]" the plaintiffs' injuries.[187]

---

[182] *Id.*, Ex. 3 (affidavit of Chief Martin Lentz).

[183] *Id.*

[184] *Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005) (citing *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

[185] *Id.* at 849.

[186] *Id.*

[187] *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *City of Canton*, 489 U.S. at 391).

-46-

Here, as noted, the plaintiff students allege that there was no training of Cleveland Heights police in riot situations.[188] Even if the sworn affidavit of Chief Lentz to the contrary is not considered as being tendered beyond the time allowed for discovery, plaintiffs have failed to establish a "history of abuse" with respect to Cleveland Heights police dealing with riot situations such as would put the City of Cleveland Heights on notice that its training, or lack of training, in this area "was deficient and likely to cause injury."[189]

Further, as noted by the Supreme Court in *City of Canton*, a failure to train action cannot be maintained based on evidence of the proved misconduct of individual officers:

> That a particular officer may have been unsatisfactorily trained will not alone suffice to fasten liability on the city, for an officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has been occasionally negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had more or better training, sufficient to equip him to avoid the injury-causing conduct. Such a claim could be made about almost any encounter resulting in an injury, yet not condemn the adequacy of the program to enable officers to respond to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.[190]

Thus, because there is here no record of a "history of abuse" by Cleveland Heights police officers in riot situations such as would put the City on notice that its training in this area was "deficient and likely to cause injury," and further because the sum total of plaintiffs' evidence of a failure to train on the part of the City of Cleveland Heights is the conduct of

---

[188] ECF # 59 at 4.

[189] *Fisher*, 398 F.3d at 849.

[190] *City of Canton*, 489 U.S. at 390-91.

some individual officers in a single incident – the very thing found unpersuasive by the Supreme Court in *City of Canton* – the Court here finds that the City is entitled to summary judgment in its favor on the claim that it failed to adequately train its police officers in violation of 42 U.S.C. § 1983.

(2)    Maintenance of an unconstitutional policy or custom

The Sixth Circuit in *Thomas v. City of Chattanooga*[191] restated what must be proved to establish a claim for damages under § 1983 arising from the maintenance of a constitutionally defective governmental policy or custom:

(1)    The existence of a clear, persistent pattern of [illegal activity];

(2)    notice, or constructive notice, on the part of the [defendant];

(3)    the [defendant's] tacit approval of the unconstitutional conduct, such that the deliberate indifference in their failure to act can be said to amount to an official policy of inaction;

(4)    the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.[192]

Moreover, as is the case of improper training, the presence of a constitutionally infirm policy or custom cannot be established by evidence of merely a single instance of constitutionally defective conduct.[193]  In sum, to prevail here the plaintiffs must identify a

---

[191] *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005).

[192] *Id*. at 429.

[193] *Id*. at 432.

-48-

policy or custom of the City and then show that their injuries were caused by the execution or implementation of that policy or custom.[194]

Considering the record in the light most favorable to the plaintiffs, the Court initially observes that there are, at best, allegations of misconduct on the part of Officer Hetrick and three other unnamed individual officers committed in the course of a single event.  As such, those allegations, even if accepted as true, do not meet the first element of the standard given in *Thomas* which requires evidence of a "clear, persistent pattern" of improper conduct on the part of the Cleveland Heights police as a whole when dealing with riot situations.

In addition, even crediting the allegations in the plaintiffs' memorandum in opposition that the area around Wendy's had been the scene of fighting after football games for some time and that the City and Wendy's devised a policy of locking the doors at Wendy's in response,[195] there is no evidence in the record as to the scope or consequences of any other instances of fighting at Wendy's, nor how the Cleveland Heights police responded if called to break up previous fighting at Wendy's.[196]  This lack of any evidence regarding any other instances of fighting at Wendy's and any response to it by Cleveland Heights police is particularly damaging to plaintiffs' claim if the city policy being attacked as constitutionally

---

[194] *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994).

[195] ECF # 59 at 4.

[196] While plaintiffs assert that the City did not train for riots and had a policy at Wendy's of dealing with riots at that one location of simply locking the door, *id*. at 3-4, there is no evidence in the record that any other previous fighting around Wendy's reached the level of a riot, caused any injuries or, if police were called, resulted in any arrests.

defective by the plaintiffs and posited as the moving force behind their injuries is the decision to lock the doors on football nights at this single Wendy's.

Indeed, there is no evidence in the record of any other riot situation, beyond the incident at the center of the complaint, to which Cleveland Heights police responded. Without any evidence of other such riot situations to which Cleveland Heights police responded, and further evidence of a "clear, persistent pattern" that the responses by the City to such situations were constitutionally flawed, there can be no proof that the City was on notice, constructive or otherwise, that its police response to riots was constitutionally defective or proof that it was deliberately indifferent to the known or obvious consequences of such information.[197]  Finally, without being able to prove the existence of a constitutionally infirm custom or policy, the plaintiffs cannot establish the final step of showing that the policy or custom was the "moving force" behind their specific injuries.

Accordingly, given that the plaintiffs have not met the tests for establishing a cognizable claim for damages under § 1983 against the City for maintaining a constitutionally defective custom or policy with its police with respect to dealing with riots, the Court finds that summary judgment in favor of the City concerning these claims is proper.

---

[197] *See*, *Board of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407 (1997) (citing *City of Canton*, 489 U.S. at 388).

5.      *Count III – false arrest and deliberate indifference to medical needs*

a.      *The City is not entitled to summary judgment under § 1983 for false arrest of plaintiff students.*

Count III of the amended complaint asserts that the plaintiff students were falsely arrested after they defended themselves from the crowd outside Wendy's.[198]  The City contends that because the plaintiff students were observed engaged in fighting at Wendy's, there was probable cause to make the arrests and thus no liability here.[199]  The plaintiff students argue that they were merely defending themselves and that this fact should have been known to the officers, precluding a reasonable belief that they were engaged in the commission of a crime.[200]

Initially the City attempts to dismiss the false arrest claim by maintaining that the plaintiffs did not properly plead the claim, failing to specifically locate the constitutional basis for it in the Fourth Amendment rather than in the due process protections of the Fourteenth Amendment.[201]  Of course, the Fourth Amendment has been incorporated into the Fourteenth Amendment so as to require states to "provide a fair and reliable determination of probable cause as a condition for any significant restraint of liberty."[202]  Thus, a complaint

---

[198] ECF # 20 at ¶ 26.

[199] ECF # 52 at 12-13.

[200] ECF # 59 at 7.

[201] ECF # 52 at 12.

[202] *Baker v. McCollan*, 443 U.S. 137, 142-43 (1979) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)).

for false arrest against a police officer acting under the color of state law would be properly pled as arising under the Fourteenth Amendment.  However, regardless of whether the City's argument has merit here, as the Court has consistently done throughout its consideration of the motions for summary judgment, it will construe the plaintiffs' claim – which clearly states a claim of false arrest – so as to not permit any mere errors of draftsmanship to deny justice.[203]

The law is plain that an arrest made without probable cause violates the Fourth Amendment and is actionable under 42 U.S.C. § 1983.[204]  For a police officer to have probable cause for an arrest, there must be "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit a crime."[205]  Probable cause "requires only the probability of criminal activity not some kind of 'prima facie' showing" of such activity.[206]  It is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

---

[203] *Ritchie*, 410 F.3d at 832.

[204] *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000).

[205] *Michigan v. DeFillipo*, 443 U.S. 31, 37 (1979); *accord*, *Donovan v. Thames*, 105 F.3d 291, 298 (6th Cir. 1997).

[206] *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

hindsight."[207]  Thus, a determination of probable cause "involve[s] an examination of all facts and circumstances within an officer's knowledge at the time of arrest."[208]

While an officer who has established probable cause to arrest is under no duty to investigate further in search of evidence which may exculpate the accused,[209] an officer, in initially determining probable cause, "cannot only look at evidence of guilt while ignoring all exculpatory evidence.  Rather, an officer must consider the totality of circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest."[210]

Here, the students were arrested on charges of "agg. riot."[211]  The Cleveland Heights police incident report codes an "agg. riot" violation as "5303."  Since that section of the Ohio Revised Code refers to real estate matters, and since the City has not provided the Court with a copy of the correct portion of either the Ohio Revised Code or city ordinance in Cleveland Heights, if any, which the students were charged with and arrested for violating, the Court has no basis for determining whether the arresting officer had probable cause for making that arrest.

------

[207] *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001).

[208] *Gardenhire*, 205 F.3d at 315 (internal citations omitted).

[209] *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999).

[210] *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 305 (6th Cir. 2005), quoting *Gardenhire*, 205 F.3d at 318 (emphasis in *Radvansky*).

[211] *See*, ECF # 56 at 80-82.  The incident report also states that the students were arrested for the offense of "arrest through telecommunications."

Stated differently, without knowledge of the specific elements of the offenses for which the students were arrested,[212] it is impossible to ascertain if the police officers had probable cause for determining that the students should have been arrested for being in violation of those ordinances or statutes.  That omission by the City is, of itself, necessarily fatal to its motion for summary judgment on this claim.

In addition, however, the facts are that a reasonable jury could find that the evidence here, viewed most favorably to the plaintiffs along with all favorable inferences from that evidence, shows that Officer Hetrick, who was one of the arresting officers here,[213] knew or had reason to know that the plaintiff students did not initiate this fight and had no intention of committing a crime by undertaking to defend themselves.

As such, this is precisely the sort of exculpatory evidence which, if known, the Sixth Circuit has explicitly directed must be considered along with any incriminating evidence as part of the process of determining probable cause.[214]  The fact that a jury here could reasonably conclude that the students here were known by Officer Hetrick to have had no intent to do anything but defend themselves would vitiate a finding of probable cause for arresting them for violating either Ohio's aggravated rioting statute or Cleveland Heights'

---

[212] The students, as noted, were booked on two charges.

[213] ECF # 56 at 80.

[214] *Radvansky*, 395 F.3d at 305.

ordinance against rioting, both of which require a purpose or intent to commit a crime along with participating in disorderly conduct.[215]

Accordingly, both because the Court has not been given the elements of the specific offense the students were arrested for violating and because a reasonable jury could find that one of the arresting officers knew prior to the arrest that the students had no purpose or intent to commit any crime, thus vitiating any probable cause for their arrest if the offense has such an element of intent, the Court finds that the motion for summary judgment by the City in its favor on the federal law claim that the plaintiff students were falsely arrested is not well-taken and is, therefore, denied.

b.    *The City is not liable under § 1983 for deliberate indifference to plaintiff students' medical needs.*

As an additional element of Count III of the amended complaint, the plaintiffs contend that after they were arrested, they were "denied access to medical treatment" by the City in violation of § 1983 and unspecified provisions of Ohio law.[216]  The City, in its motion for

---

[215] *See*, Ohio Rev. Code § 2917.02(A).  "No person shall participate with four or more others in a course of disorderly conduct in violation of section 2917.11 of the Revised Code: (1) *with purpose* to commit or facilitate the commission of a felony; (2) *with purpose* to commit or facilitate the commission of any offense of violence; (3) when the offender or any participant *to the knowledge of the offender* has on or about his person or under his control, uses or *intends* to use a deadly weapon...."  (Emphasis added).  Apparently the City of Cleveland Heights does not have an ordinance against "aggravated rioting," but Cleveland Heights Ordinance 509.01, which defines the offense of "riot," specifically prohibits four or more persons from participating in a course of disorderly conduct "*with purpose*" to: commit or facilitate the commission of a misdemeanor; intimidate a public official or impede a function of government; impede or interfere with the operation of an educational institution; or do an act with unlawful force or violence. (Emphasis added). *See*, www.conwaygreen.com/clevelandhts.htm for the text of the ordinance.

[216] ECF # 20 at ¶¶ 26, 26.

-55-

summary judgment and reply to plaintiffs' memorandum in opposition, argues that the plaintiff students cannot meet the applicable tests for liability under § 1983 for denial of medical care to a pre-trial detainee.[217]  Plaintiffs dispute that they cannot meet the applicable standard, asserting that their injuries were obvious to a layperson.[218]

Both parties do not dispute that pretrial detainees have a federal constitutional right to receive attention for medical needs, and that failure to render assistance may create liability under § 1983.[219]  Nor do the parties dispute that federal liability is established upon showing that the municipal defendant acted with "deliberate indifference" to the plaintiff students' "sufficiently serious" medical needs.[220]  The Sixth Circuit has held that a finding of "deliberate indifference ... has objective and subjective components,"[221] and has formulated the contours of such a claim as follows:

> The objective component requires a showing that the alleged deprivation is sufficiently serious – that [the plaintiff] was incarcerated 'under conditions posing a substantial risk of serious harm." ... [A]n incarcerated plaintiff who complains that a delay in medical treatment violates his constitutional rights must present "verifying medical evidence" to establish the detrimental effect of the delay....  [A plaintiff must also show that officers had a "sufficiently culpable state of mind in denying [him] medical care." Deliberate indifference is not mere negligence; instead, it requires that the officers "knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety....  The official must both be aware of facts from which the inference

---

[217] ECF # 52 at 13-16; ECF # 61 at 10-12.

[218] ECF # 59 at 7-9.

[219] *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).

[220] *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).

[221] *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005).

-56-

could be drawn that a risk of serious harm exists, and he must draw the inference.[222]

As to that portion of the test concerning verifying evidence of the detrimental effect of delay, the Sixth Circuit has recently concluded that cases of "detrimental effect of delay" are a distinct category from cases where the need for medical attention is "obvious."[223]  In cases where the initial claim for medical attention concerned "needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem,"[224] no further proof of the effect of delay is required.  As the Sixth Circuit subsequently noted, not requiring separate proof of the detrimental effect of delay in cases of obvious serious injury is because "the delay alone [in such cases] in providing medical care *creates* a substantial risk of medical harm."[225]  Independent "verifying medical evidence" of the detrimental effects of delay, however, remains "relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care."[226]

Here, the plaintiffs contend that their injuries are so obviously serious as to remove this case from the requirement of providing separate verifying medical evidence of a

---

[222] *Id.* at 796-97 (internal citations omitted).

[223] *Blackmore*, 390 F.3d at 897.

[224] *Id.*

[225] *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir.2005) (emphasis added).

[226] *Blackmore*, 390 F.3d at 898.

detrimental effect of delay.[227]  The City maintains that independent verifying evidence of a detrimental effect of delay is needed here.[228]

The uncontroverted evidence is that the sum total of the plaintiff students' visible injuries were a black eye, cut lip, bloody nose and swelling.  There is no evidence that when the students were in custody they lost consciousness or were immobilized by great pain or debilitating injury.  They were able to fully participate in their arrest and interrogation.  They were ambulatory.

In fact, the students' situation is wholly unlike those cases where the courts have found the need for immediate medical attention is obvious to a layperson because such cases "*involve life-threatening conditions or situations* where it is apparent that delay would detrimentally exacerbate the medical problem."[229]  Rather, the students here exhibited "claims involving minor maladies or non-obvious complaints of a serious need for medical care."[230]

Accordingly, this case falls into the category of cases where the Sixth Circuit has held that a plaintiff must provide verifying medical evidence of the detrimental effect of any asserted delay in receiving medical treatment in order to prevail in a § 1983 suit.[231]

---

[227] ECF # 59 at 8.

[228] ECF # 61 at 10.

[229] *Blackmore*, 390 F.3d at 897, quoting *Hill*, 40 F.3d at 1187 (emphasis added).

[230] *Id.* at 898.

[231] *Id.* at 897.

Specifically, assuming the plaintiffs can prove the following:  (1) that the plaintiff students requested medical help exactly as stated in their affidavits after their arrest; (2) that neither student received any medical attention whatsoever from Cleveland Heights for two hours between their arrest at 10 p.m. and midnight when Motley had been taken to a hospital and Muhammad had been discharged to his parents; (3) that Cleveland Heights police could have, but failed to, provide medical attention to the students sometime earlier than they did; and (4) that the injuries they sustained were exactly as they describe them to be – is there any evidence in this record, even if one were to consider the newly submitted evidence from the plaintiffs, that delaying medical attention for these injuries for up to two hours had any detrimental effect on these plaintiffs?

In considering that issue, the Court must conclude that there is no medical evidence that had these students received medical attention any earlier than they did, such earlier medical intervention would have either prevented some unfavorable consequence from occurring or produced some more favorable result.  Thus, absent "verifying medical evidence" of any "detrimental effect" from delay, merely asserting that medical attention should have been provided faster or sooner, without "verifying medical proof" as to the consequences, is here insufficient to establish the claim of "deliberate indifference."

Again, there is nothing in this record to show that attending to Motley or Muhammad two hours faster than when they actually were treated[232] would have changed anything.

---

[232] That is, assuming that they would have been provided all appropriate medical treatment for their injuries instantly upon arriving at the Cleveland Heights jail.

Accordingly, the Court finds that summary judgment for the City on the federal claim of "deliberate indifference" to the plaintiff students' medical needs is well-founded.

**6.      Counts IV and V – the parents' claims**

a.      *Plaintiff parents' claims are not cognizable under § 1983.*

As the City notes, the Sixth Circuit has clearly stated that a § 1983 claim "is entirely personal to the direct victim of the constitutional tort."[233]  Thus, "only the purported victim, or his estate's representative[s] may prosecute a § 1983 claim."[234]  Accordingly, the parents of the students here may not seek damages under § 1983 for any of the alleged federal constitutional torts committed against their sons.  The City's motion for summary judgment as to all damage claims asserted by the parents under federal law in this case is, therefore, well-taken.

b.      *Summary judgment as to the parents' damage claims under state law is granted in part and denied in part.*

The City makes two arguments concerning summary judgment as to the parents' state law claims for damages:  (1) the claims are derivative of damages incurred by the students, and since the students suffered no legally cognizable injury, the parents also must be denied damages; and (2) the parents have proven no damages for the costs of medical treatment and such claims should now be precluded.[235]

---

[233] *Claybrook*, 199 F.3d at 357.

[234] *Id.*

[235] ECF # 52 at 23-25.

Initially, the Court finds no merit in the City's argument that the parents' damage claim here is vitiated because there is no longer any viable state law action asserted by the students.  For the reasons described above, portions of the students' state law claims against Officer Hetrick personally remain.  Since Ohio law permits parental claims for damages to a minor child to proceed if an underlying injury to the minor child is shown,[236] and since certain underlying state law claims of the minor students survive, the City is without a basis by which it may eliminate all parental damages claims in a single stroke by summary judgment.  Therefore, the Court must address the particular individual elements of the parents' damage claims to determine what may proceed.

As noted by the City and as stated by the Ohio Supreme Court, "Ohio has long recognized the right of a parent to maintain a derivative action against a third-party tortfeasor who injures the parent's minor child."[237]  Historically, Ohio courts have held that a parental damage claim has two elements – the parent "may maintain the action for the child's medical expenses, and for the loss of the child's 'services.'"[238]

However, in *Gallimore*, Ohio extended the scope of what is meant by "services" of a minor child in a derivative action for injury to such a child to include "loss of filial consortium," that is, "the parent's loss of the services, society, companionship, comfort, love

---

[236] *See*, *Grindell v. Huber*, 28 Ohio St. 2d 71, 275 N.E.2d 614 (1971).

[237] *Gallimore v. Children's Hosp. Med. Ctr.*, 67 Ohio St. 3d 244, 246, 617 N.E.2d 1052, 1054 (1993).  *Accord*, *Fehrenbach v. O'Malley*, 113 Ohio St. 3d 18, 862 N.E.2d 489 at ¶ 6 of the syllabus.

[238] *Gallimore*, 67 Ohio St. 3d at 246, 617 N.E.2d at 1054, quoting *Grindell*, 28 Ohio St. 2d 71, 275 N.E.2d 614, at ¶ 1 of the syllabus.

and solace of the injured child."[239]  *Gallimore* observed that the notion of "loss of services" in this context may have been originally grounded in master-servant concepts of the common law and required proof of the monetary value of such service.[240]  But, *Gallimore* concluded, a better understanding of the true gravamen of a complaint for the loss of "services" of a minor child, particularly when most children are not now principally considered economic assets of their parents, is that "the society, companionship, comfort, love and solace between parents and their child are the essence of that relationship" and, thus, the basis for any damages, "more so than the [economic] services a minor child is capable of rendering to his or her parents."[241]

The evidence from interrogatories and depositions of the parents here is that their sons had psychological trauma from the assault which affected their relationships with their parents.[242]  Taking that evidence in the light most favorable to the plaintiffs, including reasonable inferences therefrom, a jury, if it found liability, could reasonably find state law damages for the plaintiff parents for loss of filial consortium.

As to recovery for actual medical expenses, the law is clear that a nonmoving party must present evidence of any actual damages that were incurred in order to survive a motion

---

[239] *Id.*

[240] *Id.*, 67 Ohio St. 3d at 250, 617 N.E.2d at 1056.

[241] *Id.*

[242] *See*, *e.g.*, ECF # 51, Ex. 5 (deposition of Akila Muhammad) at 10-12; Ex. 6 (deposition of Roosevelt Robinson Muhammad) at 5-7; Ex. 7 (deposition of Ahmad Roweel Gray) at 17.

for summary judgment.[243]   The Court notes that the City is correct in observing that the plaintiff parents have substantially not done so.[244]   Accordingly, given the failure, with the exception of Ahmad Gray, to furnish any evidence as to the amount of actual medical expenses incurred by the parents from which a jury could base an award of damages in this respect, the Court finds that the City is entitled to summary judgment as to precluding any claims for actual medical damages by the parents here with the single noted exception.

Finally, although the plaintiff parents have sought punitive damages for claims made under Ohio law[245] and for attorney fees,[246] the City has not moved here that these damage claims against it be denied as a matter of summary judgment.[247]   Therefore, as in previous cases discussed above, the Court offers no opinion and makes no ruling on these damage claims asserted by plaintiff parents.

---

[243] *See*, *Andretti v. Borla Performance Indus.*, 426 F.3d 824, 831 (6th Cir. 2005).

[244] ECF # 52 at 25, noting that except for a $75 co-payment made by Ahmad Gray for his son Ahmad Motley's emergency room visit and testified to in his deposition, "[n]o medical bills or related documentation was produced [by the parents] during discovery."

[245] *See*, ECF # 20 at 10, (h) and (i).

[246] *Id.* at (k).

[247] *See*, ECF # 52 at 23-25.

## IV.   Conclusion

Therefore, for the reasons stated above, summary judgment in favor of each defendant is granted in part and/or denied in part.

IT IS SO ORDERED.

Dated:   October 30, 2007                           s/ William H. Baughman, Jr.
                                                     United States Magistrate Judge